Filed 7/15/25  In re I.H. CA5

<u>NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS</u>

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIFTH APPELLATE DISTRICT

| | |
|---|---|
| In re I.H., a Person Coming Under the Juvenile Court Law. | |
| STANISLAUS COUNTY COMMUNITY SERVICES AGENCY, <br><br> Plaintiff and Respondent, <br><br> v. <br><br> A.S., <br><br> Defendant and Appellant. | F089301 <br><br> (Super. Ct. No. JVDP-22-000074) <br><br> **OPINION** |

<u>THE COURT</u>*

APPEAL from orders of the Superior Court of Stanislaus County.  Annette Rees, Judge.

Janette Freeman Cochran, under appointment by the Court of Appeal, for Defendant and Appellant.

---

\*       Before Snauffer, Acting P. J., DeSantos, J. and Fain, J.†

†       Judge of the Fresno Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

Thomas Boze, County Counsel, and Sophia Ahmad, Deputy County Counsel; Gordon-Creed, Kelley, Holl & Sugerman, Jeremy Sugerman and Anne H. Nguyen, for Plaintiff and Respondent.

-ooOoo-

Appellant A.S. (mother) is the mother of I.H., who is the subject of this dependency matter. Mother challenges the decision of the juvenile court terminating her parental rights following a contested hearing considering a permanency plan for I.H., submitted by the Stanislaus County Community Services Agency (agency) under Welfare and Institutions Code[1] section 366.26. Mother contends the court's refusal to approve in-person visits with I.H. for the preparation of a bonding study calls into question the court's conclusion the beneficial parent-child relationship exception did not apply in this case. We affirm the decisions of the court terminating mother's parental rights and denying mother's request for in-person visits with I.H. for the preparation of a bonding study.

## PROCEDURAL AND FACTUAL SUMMARY

Following a hearing on a detention petition filed on October 9, 2020, a juvenile court in Contra Costa County set a jurisdiction hearing and returned custody of two-month-old I.H. to mother. The petition alleged I.H. came within the jurisdiction of the court under relevant provisions of the Welfare and Institutions Code after a domestic violence incident between mother and J.H., her alleged father (father), occurred in her presence. At this time, mother and I.H. were living with the maternal grandmother.

An amended juvenile dependency petition was filed on January 4, 2021, alleging mother had at some point moved with I.H. from her mother's home to the home of the alleged paternal grandmother, despite a prior court order that stated I.H. should not be in

---

[1] All further statutory references are to the Welfare and Institutions Code unless otherwise indicated.

2.

alleged father's presence. The petition further alleged that on December 30, 2020, mother punched alleged father in I.H.'s presence, and that I.H. fell out of a car seat she was not properly secured into at the time. These events led to mother's arrest. Following a detention hearing held on January 6, 2021, I.H. was detained and placed into foster care. Father's status was also changed from alleged to presumed at this time.

On March 17, 2021, the juvenile court sustained the petition. On April 16, 2021, the court ordered I.H. to be placed in foster care, ordered family reunification services be provided to the parents, and gave the Contra Costa Employment and Human Services Department (department) the authority to extend overnight visits to the parents. A section 366.21, subdivision (e) six-month review hearing was set for October 1, 2021.

A status report prepared for the October 2021 review hearing recommended returning physical custody of I.H. to mother, along with providing family maintenance services. The report also recommended terminating father's reunification services because he had failed to engage in those services. Mother's visitation during the reporting period had progressed to a series of successful 10-day overnight visits, culminating in a 30-day overnight visit that was still in progress when the report was prepared. At the hearing held on October 1, 2021, the juvenile court adopted these recommendations and set a section 364 review hearing for March 18, 2022.

Before the March 2022 review hearing, the department submitted a report in January 2022, informing the juvenile court that mother had moved to Stanislaus County with I.H., but was still engaging in services. Mother reported that she was employed and living in her own apartment with I.H. However, the report also documented an incident that occurred when mother went with I.H. to retrieve mail from the paternal grandmother's house in San Francisco that resulted in a physical altercation. According to the report, father arrived at the home and tried to break up the fight that had erupted between mother and a number of paternal relatives. Mother claimed to not know that

father would be at the home when she arrived and vowed to take steps in the future to avoid such interactions, including obtaining a restraining order against father.

At the review hearing held on March 18, 2022, the juvenile court found mother resided in Stanislaus County and ordered the matter transferred to that county. On April 1, 2022, during a transfer-in review hearing, the case was accepted by Stanislaus County. At the time of the transfer, mother informed the court in Stanislaus County that she would be temporarily relocating to Sacramento for 90 days because repairs were being made to her apartment. The case worker assigned to this matter expressed some concern over mother's ability to comply with the case plan given this uncertainty in her living arrangements. The court eventually set a section 364 review hearing for September 13, 2022.

The status report prepared for the September 2022 review hearing noted mother had failed to follow through with various things she was required to do in her case plan. Specifically, mother had not obtained a dental appointment for I.H., had not transferred Medi-Cal coverage from Contra Costa County to Stanislaus County, and had failed to obtain a restraining order against father in Stanislaus County. Mother also made some inconsistent statements about her participation in domestic violence services, some of which appeared to be untrue. The report also referenced a number of incidents that suggested mother and I.H. had been in contact with father while in Stanislaus County. The juvenile court found on September 13, 2022, that mother's participation in services was minimal. After the matter was trailed to September 27, 2022, mother was admonished by the court to stay in contact with the social worker and to "actively" engage in services.

A report prepared for the October 2022 hearing described various interactions mother had with a social worker that were concerning. Specifically, the social worker was concerned that mother had not completed the case plan and had been involved in additional incidents of domestic violence. Furthermore, the social worker reported he

4.

received a phone call from San Francisco Child Protective Services on October 11, 2022, informing him that mother and father had been arrested for stealing alcohol from a large retail store and that I.H. was with her parents when this incident occurred. Additional information revealed mother was receiving benefits in another county, which called into question whether mother had actually been employed as represented or was possibly living somewhere else. The case was then again trailed to October 18, 2022.

At the hearing held on October 18, 2022, mother appeared by telephone. Mother was then warned to appear in person later that same day with I.H., or a warrant would be issued. Mother did not appear in court later that day, and the appropriate warrants were issued. Mother also did not appear at a hearing held on November 17, 2022, which considered the status of the outstanding warrants. The juvenile court found at that time that placement of I.H. was no longer appropriate with mother. A minute order for an additional hearing held on December 29, 2022, noted the earlier issued warrants were still outstanding, but mother had allowed social workers to have contact with I.H. through a video conference call.

Between October 2022 and March 2024, the whereabouts of mother and I.H. were unknown. During this time, status reports continued to be submitted to the juvenile court as required by statute, and review hearings were held. Mother appeared at each of these hearings by telephone, and did not produce I.H to the court. A status report filed with the court on September 20, 2023, indicated social workers were given the opportunity to have video conference calls with I.H. on an approximately monthly basis.

On March 22, 2024, a section 387 jurisdiction and disposition petition was filed seeking to place I.H. in foster care. The petition alleged that on March 20, 2024, a social worker was able to have in-person contact with I.H. and took her into protective custody. An order of detention was then entered on March 25, 2024. I.H. was then placed with a nonrelative extended family caregiver previously cleared for placement, who was referred to as mother's godmother. This caregiver lived in San Francisco.

On April 29, 2024, the juvenile court found good cause to continue the jurisdiction and disposition hearing to May 21, 2024.  In the same minute order granting the continuance for the hearing, the court found visits with father would be detrimental and suspended those visits.  Mother was allowed to have supervised video visits with I.H. going forward.  The report prepared for the hearing provided a factual context for the request for a continuance:

> "[T]he [a]gency was informed by the relative caregiver[2] that [I.H.] was taken from the babysitter['s] residence on April 14, 2024 by … father … and that she was ultimately returned to the babysitter.  [The r]elative [c]aregiver advised law enforcement had been notified and a report taken.  The relative caregiver expressed concerns for her safety and that of her own child[,] stating she could no longer care for [I.H.]  Given concerns for [I.H.]'s safety and the possib[ility] of her being taken by the parent(s) from the caregiver again, the [a]gency proceeded with urgently locating alternative placement for [her].  [M]other, … having absconded with [I.H.] for the past year (approx.), was also a factor in locating alternative placement for [I.H.].

> "On April 16, 2024[,] placement was located and arrangements were made with an [a]gency social services assistant (SSA) to transport [I.H.] from the relative placement in San Francisco to Stanislaus County on this same date.

> "Immediately upon arrival by the SSA in San Francisco to transport [I.H.], the SSA's vehicle was blocked in on all sides and [father] could be observed vandalizing the relative caregiver's vehicle.  [Father] also approached the county vehicle asking the SSA if she was the assigned social worker.  Multiple unknown individuals and vehicles were present at the pickup address.  [M]other … was also present at the home and was believed to be yelling and screaming along with other individuals at the home.  The SSA described the situation as chaotic and that confusion ensued.  Law enforcement responded to the situation as the relative caregiver and the SSA had contacted them.  Law enforcement was able to speak with the placement social worker, … who was on the phone with the SSA throughout the ordeal.…

---

**2**     This appears to be a reference to mother's godmother with whom I.H. had been placed, and who was technically considered a "nonrelative extended family member."

"The following day on April l7, 2024[,] the former relative caregiver advised the undersigned and placement social worker … that sometime after [I.H.] was transported by the SSA[, father] had come to her home and attempted to shoot at her home and/or at her causing her to be injured.  Her exact injuries were uncertain as well as the details of the events occurring both on April 14[, 2024] when … father took [I.H.] from the baby sitter [*sic*] and on April 16[, 2024,] when [I.H.] was moved from relative placement.  The undersigned faxed a request to the San Francisco Police [D]epartment records department to obtain police reports in order to clarify the details and timeline of events that had occurred."[3]

Father was eventually arrested on April 18, 2024, for these incidents, and charged with seven counts, including attempted murder and several weapons charges.  At this point, I.H. was removed from her placement in San Francisco, and was placed in a foster home in Stanislaus County.

In July 2024, yet another hearing was continued after mother and father were arrested for stealing liquor from a grocery store.  The section 387 jurisdiction and disposition hearing was finally held on August 20, 2024.  The juvenile court found the allegations in the section 387 petition to be true, and concluded that returning I.H. to the physical custody of mother or father would create a substantial risk of detriment to her physical and emotional well-being.  The court then denied reunification services to mother under section 361.5, subdivision (a), but allowed her to have supervised video or phone visitation with I.H.  Neither party filed a notice of an intent to file a writ petition.

A hearing to select a permanent plan was originally noticed for December 17, 2024.  On October 28, 2024, the juvenile court denied mother's request for a bonding study, stating in the minute order that mother's counsel could pursue such a study on his own, but that in-person sessions with I.H. for the study would not be allowed.  The section 366.26 report prepared by the agency was filed with the court on December 5,

---

[3]    In fact, additional details of this event were provided in the disposition report prepared in July 2024.  Information suggests a more extensive gunfight with a series of bullets being shot into an automobile in which mother and father were passengers.  Mother may have been injured by one of those bullets.

2024. The court ultimately set a contested section 366.26 hearing in this case for January 31, 2025.

At the beginning of the contested hearing, the juvenile court found there had been compliance with the Indian Child Welfare Act (ICWA). The agency also submitted the status reports and recommendation prepared in this matter to the court. Mother and the maternal grandmother each testified on mother's behalf, followed by father testifying on his own behalf. At the end of the hearing, the court found I.H. adoptable and terminated the parental rights of both mother and father.

*ICWA Compliance*

Early in these proceedings, mother and father filed documents stating they had no knowledge of any "Indian" or Native American ancestry. After the case was transferred to Stanislaus County, further inquiries were sent out to all identified maternal and paternal relatives in April 2024. That same month, father reported "he had heard of possible Native American [a]ncestry within his family but that he did not know in what particular tribe." As result of those inquires, the agency sent out letters of inquiry to three Cherokee tribes and to the Blackfeet Nation. Letters were also sent out to the California Department of Social Services, Office of Tribal Affairs, and the Bureau of Indian Affairs. In June 2024, all three Cherokee tribes responded that I.H. was not considered an "Indian Child" for purposes of ICWA. In July 2024, the agency received a response from the Blackfeet tribe also stating I.H. was not an "Indian Child" under ICWA.

During the January 31, 2025 hearing, the juvenile court found the agency had completed its investigation as required by section 224.2, and that "there is no reason to know that [I.H.] is an Indian child," and ICWA does not apply. Mother has not challenged the adequacy of the agency's compliance with ICWA in this appeal.

8.

This appeal has only been brought by mother, as father did not file a notice of appeal with this court. Therefore, our focus is on the termination of mother's parental rights to I.H.

## I. The Section 366.26 Hearing Terminating Mother's Parental Rights

### A. The Applicable Law and Standard of Review

> "The sole purpose of the section 366.26 hearing is to select and implement a permanent plan for the child after reunification efforts have failed. (*In re Marilyn H.* (1993) 5 Cal.4th 295, 304; see also § 366.26, subd. (b).) At that stage, 'the welfare agency's focus shifts from monitoring the parents' progress toward reunification to determining the appropriate placement plan for the child.' (*In re Marilyn H.*, at p. 305.)" (*In re J.D.* (2021) 70 Cal.App.5th 833, 851–852.)

Because the overriding concern is to protect the child, if the designated time period has expired and the efforts to reunify the family have failed, a juvenile court must move toward selecting and implementing a permanent plan for the child under section 366.26. (*Sara M. v. Superior Court* (2005) 36 Cal.4th 998, 1008–1009.) However, relevant to our inquiry, section 366.26, subdivision (c)(1)(B)(i) provides an exception "where '[t]he parents have maintained regular visitation and contact with the child and the child would benefit from continuing the relationship.' " (*In re J.D.*, *supra*, 70 Cal.App.5th at p. 852.) This is often referred to as the beneficial parent-child relationship exception.

The leading case defining this exception is *In re Caden C.* (2021) 11 Cal.5th 614 (*Caden C.*). The *Caden C.* court stated there are three elements a parent has the burden to prove by a preponderance of the evidence to justify the application of the beneficial parent-child relationship exception: (1) "regular visitation and contact with the child, taking into account the extent of visitation permitted"; (2) "that the child has a substantial, positive, emotional attachment to the parent—the kind of attachment implying that the child would benefit from continuing the relationship"; and

(3) "terminating that attachment would be detrimental to the child even when balanced against the countervailing benefit of a new, adoptive home." (*Id*. at pp. 632–633, 636.)

The first element of this test asks a court the "straightforward" question of whether the parent visited consistently to " 'the extent permitted by court orders.' " (*Caden C.*, *supra*, 11 Cal.5th at p. 632.) The focus of this element is on the best interest of the child as opposed to punishing or rewarding parents for good behavior in maintaining contact. (*Ibid*.)

The second element of the test asks "whether 'the child would benefit from continuing the relationship.' " (*Caden C.*, *supra*, 11 Cal.5th at p. 632.) The parent-child relationship "may be shaped by a slew of factors, such as '[t]he age of the child, the portion of the child's life spent in the parent's custody, the "positive" or "negative" effect of interaction between parent and child, and the child's particular needs.' " (*Ibid*., quoting *In re Autumn H.* (1994) 27 Cal.App.4th 567, 576.)

> "If severing the natural parent/child relationship would deprive the child of a substantial, positive emotional attachment such that," even considering the benefits of a new adoptive home, termination would "harm[]" the child, the court should not terminate parental rights. (*In re Autumn H.*, *supra*, 27 Cal.App.4th at p. 575) That subtle, case-specific inquiry is what the statute asks courts to perform: does the benefit of placement in a new, adoptive home outweigh 'the harm [the child] would experience from the loss of [a] significant, positive, emotional relationship with [the parent?]' " (*Autumn H.*, *supra*, 27 Cal.App.4th at p. 575.)

The juvenile court's focus again should be on the child, and it "must remain mindful that rarely do '[p]arent-child relationships' conform to an entirely consistent pattern." (*Caden C.*, at p. 632.)

Finally, when considering the third element, courts are required to ask "how the child would be affected by losing the parental relationship—in effect, what life would be like for the child in an adoptive home without the parent in the child's life." (*Caden C.*, *supra*, 11 Cal.5th at p. 633.) Potential negative effects from severing the relationship

might include "emotional instability and preoccupation leading to acting out, difficulties in school, insomnia, anxiety, or depression." (*Ibid*.) In contrast, an adoptive home might provide a new source of stability that alleviates "emotional instability and preoccupation," making the loss "not, at least on balance, detrimental." (*Ibid*.) Under this element, the court is again guided by the child's best interest, but in a "specific way: it decides whether the harm of severing the relationship outweighs 'the security and the sense of belonging a new family would confer.' " (*Ibid*.)

Appellate courts review a juvenile court's ruling on the beneficial parent-child relationship exception using a " 'hybrid' " standard. (*Caden C.*, *supra*, 11 Cal.5th at p. 639.) The substantial evidence standard applies to the first two elements of regular visitation and the existence of a beneficial parent-child relationship. (*Id*. at pp. 639–640.) The court's decision as to the third element—whether termination of parental rights would be detrimental to the child—is reviewed for an abuse of discretion. (*Id*. at p. 640.) "Review for abuse of discretion is subtly different, focused not primarily on the evidence but the application of a legal standard. A court abuses its discretion only when ' " 'the trial court has exceeded the limits of legal discretion by making an arbitrary, capricious, or patently absurd determination.' " ' " (*Id*. at p. 641.)

The standard of review for a court's determination that a parent did not meet his or her burden to prove the beneficial parent-child relationship exception before terminating parental rights is "whether the evidence compels a finding in favor of the [parent] as a matter of law." (*In re I.W.* (2009) 180 Cal.App.4th 1517, 1528, disapproved on other grounds by *Conservatorship of O.B.* (2020) 9 Cal.5th 989, 1010, fn. 7.) Specifically, the question is "whether the [parent's] evidence was (1) 'uncontradicted and unimpeached' and (2) 'of such a character and weight as to leave no room for a judicial determination that it was insufficient to support a finding.' " (*I.W.*, at p. 1528.)

**B. Application**

After taking testimony and hearing oral arguments from the various parties in this case, the juvenile court started by specifically finding I.H. adoptable. This finding has not been challenged by mother in her appeal. The court then noted it was statutorily bound to choose adoption as the permanent plan, unless one or both parents could establish an exception applied under section 366.26.

Again, the exception mother has focused on is referred to as the beneficial parent-child relationship, which requires a court to find there is a compelling reason to conclude that terminating parental rights would be detrimental to the child. (§ 366.26, subd. (c)(1)(B).) However, to make this finding, the juvenile court must find that not only has the parent "maintained regular visitation and contact with the child," but also that "the child would benefit from continuing the relationship." (§ 366.26, subd. (c)(1)(B)(i).) The *Caden C.* court phrased the test for determining whether the beneficial parent-child relationship exception applies as follows:

> "[W]e readily discern three elements the parent must prove to establish the exception: (1) regular *visitation and contact*, and (2) a *relationship*, the continuation of which would *benefit* the child such that (3) the termination of parental rights would be *detrimental* to the child." (*Caden C.*, *supra*, 11 Cal.5th at p. 631.)

When addressing the elements of the *Caden C.* test the juvenile court found there had been "regular visitation and contact by [mother]." We believe substantial evidence supports this finding. The court then moved on to the second element by stating:

> "In terms of the relationship and whether or not the continuation of that relationship would be of benefit to the child, we have to look at whether that relationship is substantial and positive in regard to the parent. We do look at the age of the child. [I.H.] is now four, and a portion of her life spent with the parent. And most saliently here, whether the interaction is positive or negative. [¶] … [¶]

12.

"[I.H.] has spent a significant portion of her life in [mother]'s care; however, that was directly due to mother absconding with [I.H.] and refusing to return her although ordered to do so by this Court.

"It was very clear from [mother's video] contact with the social worker at that time that she knew … she was violating this Court's order, acting contrary to that order, and very clearly refusing to return [I.H.] to placement or to surrender herself to the Court. So I don't find that mother's behavior has in all areas been positive as to [I.H.]."

The court stated it relied on the various status reports submitted into evidence summarizing the conduct of mother during this dependency matter. In its recitation of the findings, the court also addressed both the positive and negative impacts of mother's conduct. It is our belief upon a review of the record that substantial evidence also supports the court's finding against mother on this element.

When addressing the third element of the *Caden C.* test, the juvenile court noted because both mother and father were willing to engage in high-risk behaviors and used poor judgment, any benefit derived from continuing the relationship would have been outweighed by the potential detriment posed to I.H.'s stability and safety in a new adoptive home. Again, the court's findings on this element are not reviewed for substantial evidence but are instead reviewed for an abuse of discretion. (*Caden C., supra*, 11 Cal.5th at p. 640.) To overturn this finding, we would have to conclude the court " ' " ' exceeded the limits of legal discretion by making an arbitrary, capricious, or patently absurd determination.' " ' " (*Id*. at p. 641.) The record provided to this court reflects mother's repeated defiance of court orders, violent acts mother committed or participated in with father while I.H. was present, and mother's repeated false statements made to the various social workers involved in this process. We therefore cannot conclude the court made an arbitrary, capricious, or patently absurd determination based on the evidence it considered.

The statutory exceptions stated in section 366.26 allow a court, " 'in exceptional circumstances [citation], to choose an option other than the norm, which remains

adoption.' " (*Caden C.*, *supra*, 11 Cal.5th at p. 631.)  Based on a full consideration of the beneficial parent-child relationship exception stated in section 366.26, as further defined in *Caden C.*, we cannot conclude mother met her burden of proof in establishing this exception.

## II.    The Necessity of a Bonding Study

Mother contends the juvenile court abused its discretion "when it denied in person contact between mother and [I.H.] for a bonding study."  In support of this contention, mother cites Evidence Code section 730, which states in relevant part:

> "When it appears to the court, at any time before or during the trial of an action, that expert evidence is or may be required by the court or by any party to the action, the court on its own motion or on motion of any party may appoint one or more experts to investigate, to render a report as may be ordered by the court, and to testify as an expert at the trial of the action relative to the fact or matter as to which the expert evidence is or may be required."

Section 366.26, subdivision (c)(1)(B) states that parental rights shall be terminated if a child is found to be adoptable, unless a compelling reason can establish termination would be detrimental to the child.  One way to establish such a compelling reason is to show "[t]he parents have maintained regular visitation and contact with the child and the child would benefit from continuing the relationship."  (§ 366.26, subd. (c)(1)(B)(i).) Over the years courts have found that one way to assess the benefit of continuing the parental relationship is to consider a bonding study.  (See *In re M.V.* (2023) 87 Cal.App.5th 1155.)  "Bonding studies supply expert opinion about the psychological importance to the child of the relationship with his or her parent(s) to assist the court in determining whether 'the child would benefit from continuing the relationship.' " (*Id.* at p. 1179.)  While the *Caden C.* court recently instructed juvenile courts to seriously consider requests for bonding studies, where appropriate, there is no requirement a court secure a bonding study before terminating parental rights.  (*M.V.*, at p. 1179, discussing *Caden C.*, *supra*, 11 Cal.5th at p. 633, fn. 4.)  The decision whether to order or require a

bonding study is therefore subject to review using the abuse of discretion standard.  (*In re Jennifer J.* (1992) 8 Cal.App.4th 1080, 1084.)

### B.  Application

Before denying mother any in-person contact with I.H. for the purpose of a bonding study, the juvenile court referenced the fact that both parents had engaged in "high-risk behaviors" and poor judgment, impacting I.H.'s well-being, best interests, stability, and safety.  The court then stated:

> "I do want to address [mother's counsel]'s argument that a bonding study was not allowed.  [Mother's counsel] made a motion to have this Court order a bonding study which was declined.  However, of course, [Mother's counsel is] free to pursue that in his own—in his own client's behalf outside of a court order.
>
> "The Court's order was that I would not order in-person connection between [I.H.] and … mother given the prior behavior of attempting to remove her from placement in a violent manner such that [mother] even put herself in danger doing so.  Therefore it was not safe for [I.H.] to be in person for a bonding study to be conducted in person; however, certainly there are ways to have interviews and conduct a study outside of those constraints."

A bonding study was not expressly prohibited by the court.  The court's denial only addressed the availability of in-person contact between mother and I.H.  On appeal, mother has not raised any other issues which would have prevented her from going forward with a bonding study.

Based on our review of the record and the numerous incidents documenting the efforts of both mother and father to defy the juvenile court orders and to engage in dangerous conduct in I.H.'s presence, we cannot conclude the court abused its discretion on this matter.

### DISPOSITION

The orders declaring I.H. adoptable, terminating mother's parental rights, and denying in-person visits for the purpose of preparing a bonding study are affirmed.